[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION IN LIMINE
This is a wrongful death action brought under § 52-555 of the Connecticut General Statutes. This statute does not create a separate cause of action in the deceased's survivors, but permits a plaintiff's cause of action to survive after his death and adds death damages to the deceased's cause of action for those injuries which proximately caused his death. McKirdy v. Cascio,142 Conn. 80, 84 (1955).
The plaintiff's decedent, Gregory Brown, committed suicide utilizing a shotgun, and the action before the court was brought by his fiduciary against four police officers who responded to a complaint of a possibly suicidal person at the home address of the deceased. The deceased was an eighth grader, aged 13, at the time of his death. The case's very tragic aspects are made more compelling by the loss of one so young and the violence of the death.
By their account in an affidavit filed with the court in CT Page 9396 connection with another motion and in testimony heard in connection with a unity of interest hearing, the four police defendants responded to the home, located the decedent, saw no guns, found the deceased calm, found by calling and directing him to speak to the fire department that he was not the person who had called in the report, and concluded after talking to the boy that there was no suicide threat in the home. They then left the home at the direction of the defendant Povinelli, after concluding the suicide call was a hoax. After the police left, Gregory Brown committed suicide and was later found by his father when he returned home.
While municipal employees generally have qualified immunity from tort liability for the performance of discretionary acts, an exception has been recognized where the circumstances have made it apparent to the employee that the failure to act would be likely to subject an identifiable person to imminent harm. Burnsv. Board of Education, 228 Conn. 640, 645.
The defendants now move in limine to bar evidence of or argument about other facts unknown to them at the time and not apparent to them which arguably could have been discovered if they conducted further investigations outside the Brown premises or further, more intensive searches within it. Because the determination of the imminent harm to identifiable person exception to governmental immunity must be judged on what was apparent and readily seen by the officers, not on what was not so visible, the motion is granted. Burns, supra.
The imminent harm exception is the only exception which seems pertinent since no other exception to the general qualified immunity accorded to such officers is invoked by the complaint.
The allegations of paragraph 28 are as follows:
 "28. Had the defendants conducted a proper investigation or any sort of neighborhood check, they would have learned that there were several people in the immediate vicinity of the Brown house who knew that Gregory Brown had threatened to kill himself that day.
 A. Next door to the Brown's, less than 75 feet away, lived Diane and Jerome Moger and their family. The rear of the Moger home, its deck and sliding glass doors, is CT Page 9397 diagonally to the rear and left of the Brown house. Diane Moger had been Gregory's after school child care provider until Gregory was about 12 years old. Diane and Jerry Moger informally kept an eye on Gregory and their own son, Brian, even when Diane was no longer formally employed as the after school sitter for the Brown family. Because Diane Moger had been responsible for Gregory, the Mogers were familiar with the family, knew how to reach Gregory's parents, knew their work schedules, knew where they worked, and knew their telephone numbers.
 B. Brian Moger, who was at home while the police were at the Brown house less than 75 feet away, was Gregory's age and Gregory's closest friend. Brian had spent most of the afternoon of November 28 with Gregory and knew that Gregory had falsified his report card to change failing marks to better grades, that the Browns had discussed this forgery and that Gregory felt that he was `going to get killed.' Brian, Bobby Milaro and other boys had heard Gregory repeatedly, some times near tears, threaten to run away or shoot himself. Brian, Bobby and Keith knew that Gregory had described killing himself with a shotgun, had given his Dungeons and Dragons toys away, had abandoned his schoolbooks on the playground that day, and had carefully printed and signed a death message on the tennis net located on the tennis court near his house, reading: `Greg Brown was here the day he died . . . Greg Brown.'
 C. After they had separated and gone to their respective houses, Brian Moger and the other boys had talked to Gregory on the telephone, urging him not to kill himself. Brian had tried to convince Gregory to run away instead of killing himself. Brian also knew that Gregory secretly had taken the guns out of his father's closet on at least one previous occasion, and he (sic.) aware that CT Page 9398 Gregory knew where the guns and ammunition were stored.
 D. Jerome Moger had gotten home early on the afternoon of November 28, 1984, to do some vacuuming for a baby shower his wife was giving that evening. Jerry Moger knew that there were hunting guns in the Brown household. He himself was a hunter and a member of a gun club. He had discussed with Doug, Brian and Greg the possibility of the four of them going shooting at the gun range in Guilford.
 E. None of the defendants went next door prior to Gregory's death, none questioned Brian Moger, none questioned Jerome Moger, none took Gregory next door for safekeeping, and none checked to see if the Mogers knew him.
 F. Diagonally across the street from the Brown house at 357 Edgefield Avenue, less than 150 yards away, is a playground which is lighted continuously 24 hours per day. Located in the facility are basketball and tennis courts, a playground and large open playing field. When the defendants were at the Brown household speaking with Gregory, several young teenage boys, including Scott Zellner, Keith Waterfield and Gregory Waterfield, were playing basketball at the playing field there. Some of these boys had been with Gregory Brown that afternoon and had seen him write his penultimate suicide on the nearby tennis net. Some of them had seen him throw his schoolbooks and other possessions away in the nearby playground. Some had heard of his suicide plans. When these boys saw the defendants arrive with the fire truck at the Brown residence, they stopped playing and moved closer to the house and watched silently from across the street. No defendant ever crossed the street to question any of these boys, to investigate, CT Page 9399 or to uncover the critical information which was known to them."
Paragraph 28 speaks not of matters which were in fact apparent, but which arguably, in hindsight, might have become known to the public officers if other investigations or inquiries had been made.
The officer is immune for discretionary actions taken in good faith except where circumstances he has seen have made it apparent to him that some identifiable person or class of persons is in imminent peril if he or she fails to act. "Apparent" is defined in the "New College Edition of the American Heritage Dictionary of the English Language" as "(1) readily seen, open to view, visible; (2) readily understood or perceived, plain or obvious." Its synonym is "evident" which the same dictionary defines as "easily recognizable or perceived, clear, obvious."
None of the allegations set out in paragraph 28 deal with circumstances that were readily seen, open to view or visible to the officers or were plain or obvious but instead relate to matters which might have been revealed had the officers employed their discretion to conduct a more extensive investigation of neighbors and friends of the deceased, Gregory Brown, and/or a toss type of search, potentially unlawful, which went through every nook and cranny of the house.
After careful review of the many appellate decisions in this area of the law, the court is convinced that this interpretation based on the ordinary meaning of "apparent" is consistent with the various opinions which set out the governmental immunity doctrine and the exceptions which the law draws to its application. Ministerial acts involving duties which are to be performed in a prescribed manner without the exercise of judgment or discretion may result in liability due to acts or omissions of municipal employees. Tango v. New Haven, 173 Conn. 203, 205. However, where discretionary acts are involved, such as determinations by the police as to whether in their judgment there is any substance to a report of a possible suicide, they are to be held immune from liability except in those situations where it is apparent to them that failure to act will subject an identifiable person to imminent harm. Sestito v. Groton,178 Conn. 520, 528 (1979); Shore v. Stonington, 187 Conn. 147, 153. The Shore court recognized that, in matters of discretion or judgment, where society expects a municipal officer to exercise CT Page 9400 such discretion or judgment, "the public interest is not served by allowing a jury of laymen with 20/20 hindsight to second guess the exercise of a policeman's discretionary professional duty. Such discretion is no discretion at all." Shore, 187 Conn. 147,157. This is particularly so where the second guessing is done on the basis of information or circumstances not known or obvious or readily visible to the police personnel when they were called to the home and involved in making the determination whether Gregory Brown or any other person on the premises was in imminent peril of taking his own life.
The Motion in Limine is then granted as to evidence of the allegations of paragraph 28 because these allegations do not relate to matters which were apparent to the officers claiming governmental immunity.
Flynn, J.